[No. 72799-6.   En Banc.]
Argued May 20, 2003.   Decided September 11, 2003.

THE STATE OF WASHINGTON, *Respondent*, v. WILLIAM BRADLEY JACKSON, *Petitioner*.

254

*Paul J. Wasson II*, for petitioner.

*Steven J. Tucker, Prosecuting Attorney*, and *Kevin M. Korsmo, Deputy*, for respondent.

*Douglas B. Klunder* on behalf of the American Civil Liberties Union of Washington, amicus curiae.

MADSEN, J. — Petitioner William Bradley Jackson maintains that a warrant is required under article I, section 7 of the Washington State Constitution before police may attach global positioning system (GPS) devices to a vehicle in order to track the driver's movements. We agree. However, because in this case the police obtained valid warrants, we find no constitutional violation. In addition, we affirm a ruling denying Jackson's motion for a change of venue due to pretrial publicity, affirm his conviction, and uphold the exceptional sentence imposed.

## Facts

On October 18, 1999, Jackson called 911 at 8:45 A.M. to report that his nine-year-old daughter Valiree was missing from their residence in the Spokane Valley. Immediately, volunteers joined sheriff's personnel and canine units in a thorough search of the neighborhood. Deputy Scott Nelson arrived at the Jackson residence, where Valiree and Jackson had lived with his parents the previous seven months. Nelson interviewed Jackson's mother, who said she kissed a sleeping Valiree good-bye as she left for work a little before 4:30 that morning. Jackson said he had last seen Valiree at 8:15 A.M. in the front yard. Her backpack was on the front porch.

Detective Madsen, who also responded, saw bloodstains on Valiree's pillow and faded blood on the bed sheet. Jackson explained that Valiree had a nose bleed the night before, but Madsen saw nothing used to stop a nosebleed. Madsen took the bedding for analysis. Detectives soon believed that Jackson had something to do with his daugh-

ter's disappearance. They informed him of their suspicion that he may have removed Valiree from the home.

On October 23, 1999, police obtained a warrant to search the residence and impound and search Jackson's two vehicles, a 1995 Ford pickup and a 1985 Honda Accord (warrant #1). On October 26, Detective Knechtel obtained a 10-day warrant (warrant #2) to attach GPS devices to the two vehicles while they were still impounded. The devices were connected to the vehicles' 12-volt electrical systems. Use of the GPS devices allowed the vehicles' positions to be precisely tracked when data from the devices was downloaded. The vehicles were returned to Jackson but he was not informed about installment of the devices. Detective Madsen did inform Jackson that the police believed he had hastily buried Valiree's body, that animals would likely dig her up, and that the body would be found and used as evidence against him. Knechtel obtained a second 10-day warrant to maintain the GPS devices on the vehicles (warrant #3).

Data from the GPS device on the truck showed that on November 6, 1999, Jackson drove to his storage unit and then to a remote location on a logging road, the Springdale site, where the truck was motionless for about 45 minutes. Data showed that on November 10, 1999, Jackson made a trip to another remote location (the Vicari site) where he remained about 16 minutes, and then traveled to the Springdale site where the truck remained stopped for about 30 minutes, then left and stopped several other places, including the storage unit. Investigators discovered Valiree's body in a shallow grave at the Springdale site, and found evidence at the Vicari site (two plastic bags with duct tape containing hair and blood—the duct tape edge matched duct tape later found at Jackson's residence in a search pursuant to another warrant).

On November 13, 1999, after stopping at his storage unit, Jackson borrowed his neighbor's truck, telling the neighbor he had a job to finish. He borrowed the truck, he said, because he suspected he was being followed. Hunters near

the Springdale site saw him in a pickup truck close to the Springdale gravesite. When Jackson returned the truck, he left a shovel in it.

A warrant was issued for Jackson's arrest that same day. In the evening police stopped him, noting that he had been driving around with an unloaded shotgun in the vehicle and acting suicidal. He was initially hospitalized but later released and charged with Valiree's murder.

At trial, the evidence showed that Valiree suffocated. From jail Jackson wrote to his parents claiming a new hunting buddy "Craig" may have kidnapped Valiree. He subsequently admitted making this up. Instead, his defense at trial was that Valiree overdosed on a prescription anti-depressant prescribed for her by her counselor. He testified at trial that he thought that the police would blame him for the death since he had been a suspect in the unexplained 1992 disappearance of Valiree's mother, and therefore he panicked and buried the body. The State presented substantial evidence that Jackson killed Valiree because he saw her as an impediment to his reuniting with his former girl friend. Valiree and the girl friend did not get along.

There was considerable media coverage of Valiree's disappearance and subsequent events. Jackson moved several times for a change of venue due to pretrial publicity; his motions were denied. Following his trial, on October 5, 2000, a jury returned a verdict of guilty of first degree murder. The court denied Jackson's motion for a new trial or arrest of judgment due to cumulative error. The court imposed an exceptional sentence of 672 months based upon several aggravating factors, including the impact of the crime on the community.

Jackson appealed and the Court of Appeals affirmed. *State v. Jackson*, 111 Wn. App. 660, 46 P.3d 257 (2002), *review granted*, 148 Wn.2d 1008 (2003). Among other things, that court concluded that the warrants authorizing installation and use of the GPS devices were unnecessary under article I, section 7 of the Washington State Consti-

tution; the court thus did not reach the merits of Jackson's challenge to issuance of the warrants.

This court granted Jackson's petition for discretionary review. While he raised numerous arguments on appeal, he has abandoned many of them and now raises only four in his petition for review. The American Civil Liberties Union (ACLU) of Washington was granted leave to file an amicus brief on the issue of whether installation and use of a GPS device on a suspect's vehicle requires a warrant under article I, section 7.

## Analysis

The Court of Appeals held that warrantless installation and use of a GPS device on a private vehicle does not violate article I, section 7. That court appears to have reasoned that because no warrant is required, it is unnecessary to decide whether the warrants that the police actually obtained in this case were supported by probable cause. Accordingly, the first question before us is whether the Court of Appeals erred in its holding that installation and use of GPS devices on vehicles does not constitute a search or seizure under article I, section 7 of the Washington State Constitution.[1]

Article I, section 7 provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." It is now settled that article I, section 7 is more protective than the Fourth Amendment, and a *Gunwall* analysis is no longer necessary. *State v. Vrieling*, 144 Wn.2d 489, 495, 28 P.3d 762 (2001) (citing *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986)). The inquiry under article I, section 7 is broader than under the fourth amendment to the United States Constitution, and focuses on "those privacy interests which citizens of this

---

[1] Jackson does not claim or suggest in his petition for review that the Fourth Amendment was violated. Accordingly, there is no issue before us under the Fourth Amendment. There is also no question about whether chapter 9.73 RCW was violated by installation and use of the GPS devices. RCW 9.73.260(1)(b)(iii) provides that tracking devices are not communications within the privacy act.

state have held, and should be entitled to hold, safe from governmental trespass." *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984). Thus, whether advanced technology leads to diminished subjective expectations of privacy does not resolve whether use of that technology without a warrant violates article I, section 7. 102 Wn.2d at 514; *State v. Young*, 123 Wn.2d 173, 181-82, 867 P.2d 593 (1994).

■ Where a law enforcement officer is able to detect something at a lawful vantage point through his or her senses, no search occurs under article I section 7. *State v. Seagull*, 95 Wn.2d 898, 901, 632 P.2d 44 (1981); *Young*, 123 Wn.2d at 182. "[W]hat is voluntarily exposed to the general public and observable without the use of enhancement devices from an unprotected area is not considered part of a person's private affairs." *Young*, 123 Wn.2d at 182. The court has also affirmed as constitutional searches involving sense-enhancing devices such as binoculars or a flashlight, allowing police to see more easily what is open to public view. *Young*, 123 Wn.2d at 183 n.1 (citing *State v. Manly*, 85 Wn.2d 120, 124, 530 P.2d 306 (1975) (binoculars)); *State v. Rose*, 128 Wn.2d 388, 400-01, 909 P.2d 280 (1996) (flashlight). "However, a substantial and unreasonable departure from a lawful vantage point, *or a particularly intrusive method of viewing, may constitute a search.*" *Young*, 123 Wn.2d at 182-83 (emphasis added). Thus, where police used an infrared thermal device to detect heat distribution patterns within a home that were not detectable by the naked eye or other senses, the surveillance was a particularly intrusive means of observation that exceeded allowable limits under article I, section 7. *Young*, 123 Wn.2d at 182-84.

■ The court has also noted that the nature and extent of information obtained by the police, for example, information concerning a person's associations, contacts, finances, or activities, is relevant in deciding whether an expectation of privacy an individual has is one which a citizen of this state should be entitled to hold. *State v. McKinney*, 148 Wn.2d 20, 29, 60 P.3d 46 (2002) (citing *State v. Boland*, 115

Wn.2d 571, 578, 800 P.2d 1112 (1990); *Young*; 123 Wn.2d at 183-84; *In re Pers. Restraint of Maxfield*, 133 Wn.2d 332, 354, 945 P.2d 196 (1997)).

Here, the Court of Appeals first held that because Jackson's vehicles were impounded for searches pursuant to another warrant (warrant #1) at the time the GPS devices were installed, "potential interference issues" were foreclosed, and the initial intrusion was not a trespass under *Myrick*. We disagree. The Florida Court of Appeals was faced with a similar issue under the Fourth Amendment when a tracking device was installed on an airplane. Officers had a warrant authorizing installation of a device "upon or under" the aircraft, but also installed an additional tracking device under a panel at the rear of the interior of the plane. The first device failed, the second worked. The court found installation of the second device was "tantamount to an illegal entry and beyond the scope of the warrant," and suppressed evidence obtained through its use. *Johnson v. State*, 492 So. 2d 693, 694 (Fla. Dist. Ct. App. 1986). Similarly, here the warrant authorizing a search of the vehicles for blood, hair, body fluids, fibers and other evidence relevant to Valiree's disappearance did not authorize installation of GPS devices, and installation of the devices was clearly in excess of the scope of the warrant.

█ The Court of Appeals also held that use of the GPS devices was merely sense augmenting, revealing information that Jackson exposed to public view. The court noted that law enforcement officers could legally follow Jackson on his travels to the ministorage compartment and the two gravesites. We do not agree that use of the GPS devices to monitor Mr. Jackson's travels merely equates to following him on public roads where he has voluntarily exposed himself to public view.

It is true that an officer standing at a distance in a lawful place may use binoculars to bring into closer view what he sees, or an officer may use a flashlight at night to see what is plainly there to be seen by day. However, when a GPS device is attached to a vehicle, law enforcement officers do

not in fact follow the vehicle. Thus, unlike binoculars or a flashlight, the GPS device does not merely augment the officers' senses, but rather provides a technological substitute for traditional visual tracking. Further, the devices in this case were in place for approximately two and one-half weeks. It is unlikely that the sheriff's department could have successfully maintained uninterrupted 24-hour surveillance throughout this time by following Jackson. Even longer tracking periods might be undertaken, depending upon the circumstances of a case. We perceive a difference between the kind of uninterrupted, 24-hour a day surveillance possible through use of a GPS device, which does not depend upon whether an officer could in fact have maintained visual contact over the tracking period, and an officer's use of binoculars or a flashlight to augment his or her senses.[2]

Moreover, the intrusion into private affairs made possible with a GPS device is quite extensive as the information obtained can disclose a great deal about an individual's life. For example, the device can provide a detailed record of travel to doctors' offices, banks, gambling casinos, tanning salons, places of worship, political party meetings, bars, grocery stores, exercise gyms, places where children are dropped off for school, play, or day care, the upper scale restaurant and the fast food restaurant, the strip club, the opera, the baseball game, the "wrong" side of town, the family planning clinic, the labor rally. In this age, vehicles are used to take people to a vast number of places that can reveal preferences, alignments, associations, personal ails and foibles. The GPS tracking devices record all of these travels, and thus can provide a detailed picture of one's life.

We find persuasive the analysis of the Oregon Supreme Court in a case involving a radio transmitter attached without a warrant to the exterior of a suspect's vehicle.

---

[2] Additionally, as the ACLU points out with regard to the particular GPS devices used in this case, when the GPS data was downloaded, it provided a record of every place the vehicle had traveled in the *past* while the GPS was attached to the vehicle. Sense enhancement devices like binoculars and flashlights do not enable officers to determine what occurred in the past.

*State v. Campbell*, 306 Or. 157, 759 P.2d 1040 (1988). Like this State's, the Oregon constitutional protection against warrantless searches and seizures focuses on the right to privacy, which is not defined by technological advances. *Id.* at 164 (citing article I, section 9 of the Oregon State Constitution). Similarly to discussions by this court, the Oregon court emphasized the importance of the method by which the police obtained information. As the court pointed out, an officer could look through a living room window from across the street aided by a telephoto lens to observe a defendant exposing himself to public view, but the officer could not obtain the same information by entering the home without consent. *Id.* at 167. Thus, the court said, the question was not whether what the police learned by use of the transmitter was exposed to public view, but whether use of the device can be characterized as a search. *Id.* The court said that "[i]ntrusions and technologically enhanced observations into 'protected premises' infringe [protected] privacy interests . . . but the question whether an individual's privacy interests have been infringed by an act of the police cannot always be resolved by reference to the area at which the act is directed." *Id.* at 169. The court said that a privacy interest is "an interest in freedom from particular forms of scrutiny." *Id.* at 170. The court reasoned that use of a device that enabled the police to locate a person within a 40-mile radius day or night "is a significant limitation on freedom from scrutiny" and "a staggering limitation upon personal freedom." *Id.* at 172. The court noted that allowing use of such radio transmitters would mean that "individuals must more readily assume that they are the objects of government scrutiny" noting that commentators "have observed that freedom may be impaired as much, if not more so, by the threat of scrutiny as by the fact of scrutiny." *Id.* The court held that a warrant was required, and affirmed suppression of evidence obtained.[3]

If police are not required to obtain a warrant under

---

[3] The Oregon court later said that it did not establish in *Campbell* a per se rule that use of any technological advancement automatically violated the state constitution. *State v. Wacker*, 317 Or. 419, 426 n.12, 856 P.2d 1029 (1993).

article I, section 7 before attaching a GPS device to a citizen's vehicle, then there is no limitation on the State's use of these devices on any person's vehicle, whether criminal activity is suspected or not. The resulting trespass into private affairs of Washington citizens is precisely what article I, section 7 was intended to prevent. It should be recalled that one aspect of the infrared thermal imaging surveillance in *Young* that troubled us was the fact that if its use did not require a warrant, there would be no limitation on the government's ability to use it on any private residence, at any time, regardless of whether criminal activity is suspected. *Young*, 123 Wn.2d at 186-87.

As with infrared thermal imaging surveillance, use of GPS tracking devices is a particularly intrusive method of surveillance, making it possible to acquire an enormous amount of personal information about the citizen under circumstances where the individual is unaware that every single vehicle trip taken and the duration of every single stop may be recorded by the government.

■ We conclude that citizens of this State have a right to be free from the type of governmental intrusion that occurs when a GPS device is attached to a citizen's vehicle, regardless of reduced privacy expectations due to advances in technology. We hold that under article I, section 7 a warrant is required for installation of these devices.

Because we hold that installation and use of a GPS device on a private vehicle involves a search and seizure under article I, section 7, we next consider whether the issuance of the two warrants obtained in this case were supported by probable cause.

■ A search warrant may be issued only upon a determination of probable cause. *State v. Gore*, 143 Wn.2d 288, 296, 21 P.3d 262 (2001). Probable cause exists where the affidavit in support of the warrant sets forth facts and circumstances sufficient to establish a reasonable inference that the defendant is probably involved in criminal activity and that evidence of the crime may be found at a certain location. *State v. Vickers*, 148 Wn.2d 91, 108, 59 P.3d 58

(2002); *State v. Thein*, 138 Wn.2d 133, 140, 977 P.2d 582 (1999). The affidavit must be based upon more than mere suspicion or personal belief that evidence of the crime will be found at the place to be searched. *Vickers*, 148 Wn.2d at 108. A judge's decision to issue a warrant is reviewed for abuse of discretion, and great deference is accorded that decision. *Id.* The affidavit is evaluated in a commonsense manner, rather than hypertechnically, and any doubts are resolved in favor of the warrant. *Id.* at 108-09; *State v. Helmka*, 86 Wn.2d 91, 93, 542 P.2d 115 (1975); *State v. Partin*, 88 Wn.2d 899, 904, 567 P.2d 1136 (1977).

The affidavit in support of issuance of the initial warrant for the GPS devices included the following: Bloodstains were found on Valiree's pillow and sheet. More than one red pubic hair was found in her sheets, and both she and Jackson have red hair. Her family physician had advised the detective that Valiree had not reached puberty and to his knowledge did not have pubic hair.[4] The affidavit said this suggested the possibility the father was donor of the hair and the possibility of some kind of sexual misconduct or assault. Valiree had been taught by her grandmother to scream if threatened, but no screams were heard. Her backpack was found on the front porch of the residence. The house and neighborhood had been thoroughly searched. No one else saw the child between 4:30 A.M. and 8:30 A.M., and there was some evidence she had been missing only a half hour. Mr. Jackson was the only person at the home and he had access to two vehicles. The affidavit in support of the additional warrant, seeking an extension of 10 days of surveillance using the GPS devices, was an addendum.

In light of the thorough search of the residence and neighborhood, a reasonable person could infer that Valiree had been removed, likely in a vehicle. Since no screams were heard, an inference could be drawn that Valiree might

---

[4] This ultimately proved not to be true in fact, and Jackson challenged inclusion of this information. However, the physician, who had seen Valiree several times in 1999, did tell the detective that Valiree did not have pubic hair to his knowledge and had not reached puberty and the accurate statement of this information in the affidavit was not a misrepresentation.

have been killed or that she was either incapacitated or removed by someone she trusted. Given the limited time frame, it could also be inferred that there was insufficient time to hide her or her body or other incriminating evidence. Further, if she were alive or alive and incapacitated, the abductor would need to assure she would not escape and to provide for her basic needs. The presence of red pubic hair when her physician advised that she had not reached puberty suggests the possibility of sexual assault or an attempt, possibly by Jackson, who has red hair. Jackson was the only one present at the residence, and it would be reasonable to infer that he had something to do with Valiree's disappearance given all the facts and circumstances.

    ■ We conclude that the affidavits set forth sufficient facts and circumstances for a reasonable person to infer that Jackson was probably involved in a crime and that installation of the GPS devices would lead to evidence of that crime, i.e., that Jackson might use a vehicle to travel to provide for Valiree's needs since it was reasonable to infer that she might still be alive. And, assuming she was dead, it was reasonable to infer that Jackson would use a vehicle to drive to her location to thoroughly hide the body and dispose of evidence, given the limited time that would have been available to Jackson the morning Valiree disappeared.

    Jackson argues, however, that the affidavit in support of the first of the two warrants relating to the GPS devices contains a generalization of the kind disapproved in *Thein*, and therefore the affidavit did not establish probable cause. The affidavit provided, in addition to the information described above, the affiant's statement that he was "aware and has been told that in some homicide cases and others, the perpetrator has returned to crime scenes, for various reasons." Clerk's Papers (CP) at 25.

    In *Thein*, the affidavit contained only generalized statements of belief about drug dealers' common habits, particularly that such persons commonly keep a portion of their drug inventory, paraphernalia, drug trafficking records,

large sums of money, financial records of drug transactions, and weapons in their residences. The affidavit expressed the belief that such evidence would be found at the suspect's address. We found that such generalizations do not establish probable cause for issuance of a search warrant for an alleged drug dealer's residence, since a finding of probable cause must be grounded in fact. *Thein*, 138 Wn.2d at 146-47. "Absent a sufficient basis in fact from which to conclude evidence of illegal activity will likely be found at the place to be searched, a reasonable nexus [between the items to be seized and the place to be searched] is not established as a matter of law." 138 Wn.2d at 147. We declined to essentially adopt a per se rule that once a person is determined to be a drug dealer, then a finding of probable cause to search that individual's residence would automatically follow. *Id.* at 141.

The trial court here attempted to distinguish *Thein*, saying that the idea that drug dealers keep drugs in their homes is not as "common-sensical" as the idea that criminals return to the scene of their crimes. CP at 277. However, the statement about criminals returning to the scene of the crime, if accepted, would substitute for specific facts and circumstances establishing probable cause. The statement also suggests that probable cause to attach a tracking device to a suspect's vehicle would automatically follow in any case where the criminal activity might involve more than one location. We conclude that similar to the circumstances in *Thein*, the statement here is a generalization that by itself cannot establish probable cause to issue a warrant.

Unlike the case in *Thein*, however, the affidavit here establishes the necessary probable cause, as discussed above, without the generalization about which Jackson complains.

Jackson also argues that the two warrants authorized a "fishing expedition[ ]"—a general exploratory search to see what could be found when the GPS data was downloaded. Br. of Appellant at 44-45. This again focuses on

the generalization about criminals returning to the scene of the crime. However, to the extent this suggests a challenge to the degree of particularity regarding the place to be searched and items to be seized, we find no constitutional difficulty. As to particularity of place, the warrant was issued to authorize installation of the GPS devices on the vehicles for stated periods of time in order to track where Jackson went. Thus, the "place" searched is the travel pattern of the vehicles after placement of the devices and the item to be seized is the location of Jackson's movements. The routes obviously could not be identified with any greater specificity, but a description of the place to be searched and items to be seized is valid if it is as specific as the nature of the activity under investigation permits. *State v. Perrone*, 119 Wn.2d 538, 546, 834 P.2d 611 (1992).

In *United States v. Karo*, 468 U.S. 705, 718, 104 S. Ct. 3296, 82 L. Ed. 2d 530 (1984), the Court held that the warrantless installation of a beeper in an ether can with the consent of an informant who transferred several cans of ether to the suspect violated no Fourth Amendment interest, but that monitoring the beeper after it was taken inside a private residence violated the warrant requirement. The Court rejected the government's argument that a warrant for tracking a beeper inside a private residence should not be required because of difficulty complying with the particularity requirement of the Fourth Amendment. The government had argued it could not describe the place to be searched because that was what was sought to be discovered through the search. The Court said that regardless,

> it will still be possible to describe the object into which the beeper is to be placed, the circumstances that led agents to wish to install the beeper, and the length of time for which beeper surveillance is requested. In our view, this information will suffice to permit issuance of a warrant authorizing beeper installation and surveillance.

*Karo*, 468 U.S. at 718.

We find this reasoning persuasive. The affidavit here described the place to be searched and the items to be

seized with as much particularity as the circumstances permitted, and the warrants did not authorize a "fishing expedition."

We hold that the affidavits in support of the warrants authorizing installation and use of GPS devices on Jackson's vehicles established probable cause for issuance of the warrants.

Next, Jackson maintains that the trial court erred in denying his motion for a change of venue due to pretrial publicity. Adverse pretrial publicity can create a presumption in a community that jurors' claims that they can be impartial should not be accepted, and the totality of circumstances is examined to decide whether such a presumption arises. *Patton v. Yount*, 467 U.S. 1025, 1031, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984) (citing *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961)). The "defendant must show a probability of unfairness or prejudice from pretrial publicity." *State v. Hoffman*, 116 Wn.2d 51, 71, 804 P.2d 577 (1991); *see Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966). The fact that "the great majority of veniremen" remember a case, without more, is "essentially irrelevant. The relevant question is not whether the community remembered the case, but whether the jurors at [the] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton*, 467 U.S. at 1035 (citing *Irvin*, 366 U.S. at 723).

The trial court's decision to grant or deny a motion for a change of venue is within the trial court's discretion, and appellate courts are reluctant to reverse the trial court's decision absent a showing of abuse of discretion. *State v. Clark*, 143 Wn.2d 731, 756, 24 P.3d 1006, *cert. denied*, 534 U.S. 1000 (2001); *Hoffman*, 116 Wn.2d at 71. This court applies factors identified in *State v. Crudup*, 11 Wn. App. 583, 524 P.2d 479 (1974) in determining whether a trial court abused its discretion by granting or denying a motion for a change in venue due to pretrial publicity. *E.g.*, *State v. Rice*, 120 Wn.2d 549, 556, 844 P.2d 416 (1993);

*Clark*, 143 Wn.2d at 756; *Hoffman*, 116 Wn.2d at 72. The factors are:

(1) the inflammatory or noninflammatory nature of the publicity; (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn.

*Crudup*, 11 Wn. App. at 587. Previous cases applying these factors may be helpful, but are not dispositive because each case is factually unique. *Rice*, 120 Wn.2d at 556.

Jackson argues that while the Court of Appeals properly reviewed all the *Crudup* factors, it erred in finding no abuse of discretion. He contends that where the appellate court finds that some of the factors favor a change and others are neutral, an abuse of discretion must be found if the trial court denies a motion for a change of venue. We disagree. Instead, careful consideration and balancing of all the *Crudup* factors and the facts in a particular case is the appropriate course. Here, although the publicity was at times extensive, and some of it inflammatory, and the great majority of the veniremen had heard of the case, the care taken by the trial court to ensure an impartial panel leads us to conclude that the Court of Appeals correctly found no abuse of discretion.

We note that although Jackson apparently accepts the Court of Appeals' assessment of each factor, we believe that the fourth factor, the care exercised and difficulty encountered in selection of a jury, does not present as close a question as that court believed. In his opening brief, Mr. Jackson said this factor best supports his view that his motion should have been granted, and the Court of Appeals agreed this factor was closer than the others. We disagree.

Jackson first seems to argue that his motion should have been granted on a presumption of bias before voir dire. The Court of Appeals disagreed, noting that " 'the best test of whether an impartial jury could be empaneled [is] to attempt to empanel one.' " *State v. Jackson*, 111 Wn. App. 660, 673, 46 P.3d 257 (2002) (quoting *Hoffman*, 116 Wn.2d at 72-73).

The fact that the vast majority of the venire had heard about the case is not the relevant question—the relevant question is whether the jurors at the trial had such fixed opinions that they could not be impartial. *Patton*, 467 U.S. at 1035 (citing *Irvin*, 366 U.S. at 723). Voir dire provides a means to make this determination. This is not the extreme case where publicity has so obviously saturated the community that a presumption of bias should arise. *See Rideau v. Louisiana*, 373 U.S. 723, 725-26, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963).[5] We conclude that the trial court did not abuse its discretion in denying the motion before voir dire.

Jackson also maintains that the sheer number of prospective jurors who were excused for cause is the strongest evidence of the "overwhelming pretrial bias." Br. of Appellant at 38. The trial court instructed the potential jurors to avoid media coverage or discussion about the case, and inquired of each individual during voir dire whether this instruction had been followed. Other than those jurors dismissed outright for admitted bias, the defense was able to thoroughly question each prospective juror individually in camera. About two-thirds of the prospective 143 jurors were excused for cause—53 mainly due to pretrial publicity or personal knowledge about the case. Thirty-four were

---

[5] For a nearly unbelievable case where media involvement in, coverage of, and misrepresentation of a case, both pretrial and during trial, obviously saturated a community, see *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966). Even in that case, however, the Court said that it could not say that the defendant was denied due process by the judge's refusal to take precautions against the influence of pretrial publicity alone; instead, due process was violated by the judge's rulings in combination with the trial setting (a media circus where, among other things, reporters were seated within the bar, examined and photographed trial exhibits lying on counsel tables, hounded the participants including the defendant, and made so much noise that testimony was often unintelligible, and hundreds of reporters, cameramen and a helicopter fly-over accompanied the jury when it viewed the scene of the crime). 384 U.S. at 354-55.

excused for other causes, mainly personal hardship. Four of the twelve members of the jury were never challenged for cause, and the remaining eight were challenged for cause by the defense during individual voir dire. The eight jurors who were challenged for cause had heard of the case, but voir dire established they had no fixed opinions about the case. Significantly, Jackson does not identify any specific members of the seated jury or the alternates as being biased, nor does he refer to any of the questions or responses during voir dire as demonstrating these jurors' preexisting fixed opinions about the case. Instead, as the trial court characterized it, the defense used a "blanket exercise of challenges for cause" approach. Report of Proceedings at 1662. Following individual voir dire, the jurors and alternates were selected in general voir dire without apparent difficulty. Once selected, they were instructed many times to avoid media publicity and discussion about the case.

Here, as in several cases where this court has upheld a denial of change of venue, the record shows that the trial court "took great care in the jury selection procedure and offered defendants the opportunity to question individual prospective jurors alone in case any specific publicity may have unduly influenced a particular juror." *Hoffman*, 116 Wn.2d at 72; *see Clark*, 143 Wn.2d at 758-59 (of 162 prospective jurors filling out questionnaires, 15 percent claimed they had not seen, read, or heard anything about the case, 63 percent of those remaining said they had formed no opinion; individual voir dire conducted of 114 prospective jurors; of the 12 jurors selected, 2 claimed they had not seen, read or heard anything about the case, 2 could not remember specifics about what they had seen or read, 1 who was not challenged for cause had formed an opinion but said she could set it aside, and 7 remembered something specific about the case but had not formed an opinion); *Rice*, 120 Wn.2d at 558 (nearly all of 153 prospective jurors knew of the murders; they were repeatedly instructed regarding their duties and responsibilities; over a

three-week period, all underwent extensive individual questioning); *State v. Rupe*, 108 Wn.2d 734, 752-53, 743 P.2d 210 (1987) (lengthy, extensive individual voir dire conducted; 11 days for jury selection).

We affirm the Court of Appeals holding that there was no abuse of discretion in denial of Jackson's motions for a change of venue due to pretrial publicity. Jackson has not established a probability of unfairness or prejudice resulting from pretrial publicity.

Jackson's next challenge is to the trial court's exceptional sentence of 672 months based upon four aggravating factors: (1) the victim's particular vulnerability, (2) violation of a position of trust, (3) concealment of the crime beyond that normally associated with murder, and (4) impact of the crime on the community and on the students at the elementary school Valiree had attended. Jackson challenges only the last of these aggravators.[6] The Court of Appeals upheld this factor, and noted that the trial court had determined that any one of the factors would support the sentence imposed. Jackson complains that "[t]he fact the other factors may be valid, if the conviction is affirmed, is not a reason to validate an erroneous factor." Pet. for Review at 5.

An exceptional sentence may be imposed if there are substantial and compelling reasons to impose an exceptional sentence. RCW 9.94A.535 (formerly RCW 9.94A.390 (2000)). An exceptional sentence will be reversed only where the reviewing court finds that the reasons relied upon by the appellate court are not supported by the record under a clearly erroneous standard; that the reasons relied upon do not justify an exceptional sentence under a de novo standard of review; or that the sentence imposed is clearly

---

[6] At sentencing, Mr. Jackson's counsel argued against the exceptional sentence, relying in part on the real facts doctrine. In his appellant's brief to the Court of Appeals he states that he makes the same argument on appeal. However, no argument is included, and he has instead attempted to incorporate the sentencing argument by reference to the record. We decline to consider these arguments made at trial and the attempted incorporation of them by reference. *See, e.g., U.S. W. Communications, Inc. v. Utils. & Transp. Comm'n*, 134 Wn.2d 74, 111-12, 949 P.2d 1337 (1997); *State v. Brett*, 126 Wn.2d 136, 205-06, 892 P.2d 29 (1995); *State v. Kalakosky*, 121 Wn.2d 525, 540 n.18, 852 P.2d 1064 (1993).

excessive or clearly too lenient, under an abuse of discretion standard. RCW 9.94A.585(4) (formerly RCW 9.94A.210(4) (2000)); *State v. Borg*, 145 Wn.2d 329, 336, 36 P.3d 546 (2001); *State v. Nordby*, 106 Wn.2d 514, 517-18, 723 P.2d 1117 (1986). Jackson contends that the community impact aggravating factor is not supported by the facts and is legally insufficient to justify an exceptional sentence.

In *State v. Johnson*, 124 Wn.2d 57, 73-76, 873 P.2d 514 (1994), the court held that community impact reasonably foreseeable to the defendant may serve as an aggravator justifying an exceptional sentence. The impact on others must be of a destructive nature not normally associated with the commission of the offense in question. 124 Wn.2d at 74-75; *see State v. Pennington*, 112 Wn.2d 606, 610, 772 P.2d 1009 (1989) (an exceptional sentence is appropriate only where the circumstances of the crime distinguish it from others of the same category). In *Johnson*, the defendant was involved in a "gang" drive-by shooting immediately next to a public elementary school that was in session. Testimony was presented showing that witnesses to the shooting included children about to be released from school and their parents, and the trial court found that after the shooting children were afraid to attend school and parents feared for the safety of their children while at school. *Johnson*, 124 Wn.2d at 75. This court concluded that it was reasonably foreseeable to the defendant that the children and their parents, who were not the intended victims, would be traumatized by one who discharges a deadly weapon at fleeing persons in an automobile in the immediate vicinity of a public elementary school, and that this resulting trauma distinguished the case from other assaults. 124 Wn.2d at 75-76.

The Court of Appeals has also found that the impact on third parties justifies an exceptional sentence upward. In *State v. Cuevas-Diaz*, 61 Wn. App. 902, 812 P.2d 883 (1991), for example, children present in the home during an attack on their mother were traumatized by the attacks, and the Court of Appeals found impact on these third parties to be

a valid aggravator. However, that court rejected impact on the community as an aggravator, reasoning that while a community suffers from criminal acts, this is always the case. 61 Wn. App. at 905. In *State v. Way*, 88 Wn. App. 830, 946 P.2d 1209 (1997), the court also rejected the impact on the community factor. There, the defendant shot his estranged wife on a community college campus, also shot at a student arriving in a car, and many other students on campus heard or saw the shooting while taking cover. The court reasoned that while the record showed psychological impact on students, and this was foreseeable to the defendant, the circumstances of the crime did not set it apart from any other murder committed in a public place where adults might witness it. 88 Wn. App. at 834.

Here, the trial court found:

> The defendant's use of a false abduction story to aid in covering up the murder of his daughter had an impact on the community. The students, parents and staff of McDonald Elementary, where Valiree Jackson attended the third grade, were tremendously impacted. Parents would no longer allow children to walk to and from school alone for fear that they to [sic] might be abducted. Children had nightmares and their schoolwork was affected. The principal, Jan Lenhart, would personally follow children home to make sure they arrived safely.

> Beyond McDonald Elementary, the whole community was impacted. The Spokane County Sheriff's Department invested tremendous resources to search for a missing child. People held candlelight vigils, praying for Valiree's safe return. People searched and handed out flyers. People contributed to a fund set up by the defendant. All of this was reasonably foreseeable by the defendant, since he was the one who created the story and knew Valiree Jackson was really dead.

CP at 556 (finding of fact 5).

Some of these findings do not distinguish this crime from others of the same kind. Where a child (or adult) disappears and criminal activity is indicated, it is not unusual that resources will be expended in searching for the missing person or that the community will participate in activities

to help. However, the findings regarding the impact on the children at Valiree's school, which are supported by the testimony of Valiree's teacher, principal, and school counselor, justify the exceptional sentence as in *Johnson*, and distinguish this case from *Cuevas-Diaz* and *Way*.

■ We uphold this aggravating factor. Accordingly, we need not reach Jackson's claim that the presence of other aggravators does not overcome the invalidity of one factor. Nevertheless, we note that the law is to the contrary. Where the reviewing court overturns one or more aggravating factors but is satisfied that the trial court would have imposed the same sentence based upon a factor or factors that are upheld, it may uphold the exceptional sentence rather than remanding for resentencing. *State v. Gore*, 143 Wn.2d 288, 321, 21 P.3d 262 (2001); *State v. Cardenas*, 129 Wn.2d 1, 12, 914 P.2d 57 (1996) (affirming sentence while invalidating two of three aggravators).

We affirm the exceptional sentence imposed.

■ Finally, Jackson raises the trial court's alleged error in denying his motion for a new trial or arrest of judgment on the basis of cumulative error. *See* CrR 7.4, 7.5. However, we find no error. The grant or denial of a motion for a new trial is within the trial court's discretion, and no abuse of that discretion occurs where there is no error, much less cumulative error, as claimed. *State v. Copeland*, 130 Wn.2d 244, 294, 922 P.2d 1304 (1996).

## Conclusion

Article I, section 7 protects from government intrusion those privacy interests that people in Washington have traditionally held as well as privacy interests they should be entitled to hold. Absent a recognized exception to the warrant requirement, attachment of a GPS device to a vehicle without a warrant violates these privacy interests. Requiring a warrant ensures that use of GPS technology will be limited to circumstances in which law enforcement has probable cause to believe that criminal activity had

occurred or is occurring and will protect innocent citizens from unwarranted and highly intrusive police surveillance. Here, however, law enforcement officers properly obtained valid warrants; thus, evidence obtained through use of the device was properly admitted. Further, we hold that the trial court did not abuse its discretion in denying Jackson's motions for a change of venue or in denying his motion for a new trial and/or arrest of judgment on the basis of cumulative error. Finally, with regard to the exceptional sentence imposed, we hold that the aggravating factor of impact of the crime on the community is a valid factor in this case.

We affirm the Court of Appeals and uphold the judgment and sentence.

ALEXANDER, C.J., and JOHNSON, SANDERS, IRELAND, BRIDGE, CHAMBERS, OWENS, and FAIRHURST, JJ., concur.