IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| STATE OF WASHINGTON, | ) | No. 71823-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| RODOLFO JEREZ-SOSA, | ) | |
| | ) | |
| Appellant. | ) | FILED: August 10, 2015 |

SCHINDLER, J. — A jury convicted Rodolfo Jerez-Sosa of robbery in the first

degree while armed with a firearm. Jerez-Sosa seeks reversal, arguing the trial court

erred in denying his motion for a mistrial. We disagree, and affirm.

FACTS

Around 10:30 p.m. on September 7, 2012, Yellow Cab driver Fasil Berhanu

drove to Safeco Field after a Seattle Mariners game had just ended. Two men, later

identified as Asuan Santos-Valdez and Rodolfo Jerez-Sosa, hailed his cab. Santos-

Valdez told Berhanu to drive to Beacon Hill.

When Berhanu reached the intersection of Beacon Avenue South and 13th

Avenue South, Santos-Valdez told Berhanu to turn left and park. After he stopped,

Santos-Valdez told Berhanu, "Just give me everything, . . . whatever you have." When

Berhanu turned around, Santos-Valdez said, "Just give me the money." Santos-Valdez

then hit Berhanu in the face with a gun, breaking his cheekbone. Berhanu gave Santos-Valdez his wedding ring, his watch, and some cash.

Santos-Valdez told Jerez-Sosa to "[t]ake everything." Jerez-Sosa took Berhanu's wallet, two cell phones, and a bag containing Berhanu's for-hire license and Good To Go! toll pass from the front passenger seat. Jerez-Sosa also took Berhanu's keys and sunglasses from the center console, pulled out the wires connecting the radio and dispatch computer, and obscured the cab's security camera with the sun visor.

Bystander David Mitchell saw Berhanu "being robbed or being beaten up" by Jerez-Sosa and Santos-Valdez. Mitchell called 911.

The State charged Jerez-Sosa and Santos-Valdez with robbery in the first degree. Santos-Valdez entered into a plea agreement. As part of the agreement, Santos-Valdez agreed to testify against Jerez-Sosa. The State amended the information to charge Jerez-Sosa with robbery in the first degree while armed with a firearm. Jerez-Sosa notified the State that he intended to assert a duress defense based on the testimony of forensic psychologist Dr. Delton Young that Jerez-Sosa suffered from post-traumatic stress disorder (PTSD).

Before trial, Jerez-Sosa moved to exclude evidence of prior bad acts under ER 404(b). Defense counsel stated that "in our interview of Mr. Santos-Valdez, . . . he mentioned a number of times purported criminal behavior that my client had participated in prior to these allegations that we're here for today." The prosecutor agreed he would not elicit the testimony "until a duress defense is actually formally offered or introduced to a jury." The prosecutor stated, "[I]f the case does proceed as planned, we anticipate that some of that evidence will come in in order to rebut the duress defense and this

2

theory that Mr. Jerez-Sosa is afraid of Asuan Santos-Valdez." The trial court ruled:

> [A]t least in its case in chief, the State's witnesses will not refer to any [ER] 404(b) material with respect to Mr. Jerez-Sosa.
> If during the trial the State believes that it may be admissible under 404(b), let's discuss that outside the presence of the jury. But at least at this point, until we get to rebuttal, there should be no surprises in terms of witnesses talking about 404(b) material.

Defense counsel addressed the duress defense during opening statement. Defense counsel told the jury that "Mr. Jerez-Sosa will testify in this case and he will say that he was threatened. He will tell you that he has been shot in the past and the threat of being shot again was real and he was very, very scared." Defense counsel told the jury that Dr. Young "will explain to you the impact of a gun being brandished on a person who had been shot twice in the past."

A number of witnesses testified during the six-day trial, including Berhanu, Santos-Valdez, Mitchell, a Seattle Police Department detective, a video specialist to authenticate the security camera video from the cab, and Dr. Young.

Berhanu testified that Santos-Valdez and Jerez-Sosa spoke to each other in a "normal tone" of voice during the cab ride. Berhanu did not hear Santos-Valdez raise his voice or make any threats to Jerez-Sosa, nor did he see Santos-Valdez point a gun at Jerez-Sosa. Berhanu testified that Jerez-Sosa did not appear scared or frightened. Berhanu said they were "working together."

Mitchell testified that Jerez-Sosa and Santos-Valdez "took off running together" and "raced up" a nearby staircase. Mitchell stated that as Jerez-Sosa and Santos-Valdez ran off, the two men were "a foot or two" apart and appeared to be together. Mitchell also testified Santos-Valdez did not point a gun or make any threatening gestures at Jerez-Sosa.

3

Before Santos-Valdez took the stand, the prosecutor told Santos-Valdez that he would not ask "about other robberies or other crimes that Mr. Jerez-Sosa is allegedly involved in." The prosecutor instructed Santos-Valdez to "not volunteer that information or tell that information to the jury," and to ask the judge if he had "any questions or concerns about something I've asked." Santos-Valdez stated that he understood. The trial court also told Santos-Valdez, "So no mention of other alleged crimes that Mr. Jerez-Sosa was involved with unless we take up that matter outside the presence of the jury and I tell you specifically that you can say something about those other areas, okay?"

During direct examination, Santos-Valdez testified he had been friends with Jerez-Sosa, Oreste Duanes-Gonzales, Lazaro Valle-Matos, and "Jorge" since they were teenagers living in the same foster home. Santos-Valdez said that on the day of the robbery, the five men were driving around "pretty much looking for a victim and somebody to rob money." Santos-Valdez explained, "We was looking for a victim to rob since — first of all, the gun was not even — it didn't even belong to me, it belonged to them, and we was going to — the plan — well, we actually came up with a plan first."

In response to Santos-Valdez's testimony, "We wanted to — I'm kind of confused here, because I don't know if I [am] supposed to say this, but we was actually going to rob something different," the prosecutor said, "Okay." Santos-Valdez testified, "We was going to —" and defense counsel objected. The trial court overruled the objection. Santos-Valdez then testified, "Okay. [Jerez-Sosa] wanted to rob the liquor store and I didn't agree. He said that he got away with robbing liquor stores before and was

4

<u>successful at it</u>, but —."[1]  Defense counsel objected as Santos-Valdez said, "— I didn't

want to do it."  The trial court again overruled the objection.  Santos-Valdez said, "We

end[ed] up not doing it."  Santos-Valdez testified the men "came up with a plan" to go to

Safeco Field.

> So somebody mentioned in the van the taxi. Since it wasn't a busy day,
> the Mariners was playing, so it's pretty busy, they got money.  So we all
> agree and we come up — we come up with a plan that me and him was
> going to be dropped off in downtown Seattle by the Safeco Field [by]
> Lazaro and Oreste and Jorge.

Santos-Valdez described how he and Jerez-Sosa planned to take a cab from

Safeco Field to the Lago Vista Apartments in Beacon Hill where there was a dark street

with stairs nearby.

> There's stairs, so we could actually rob them, rob the taxi cab there, take
> his keys, his phones, whatever, and then run towards the stairs, which
> [are] really dark.  He wouldn't — he couldn't — he wouldn't have been
> able to see what way we went.

According to Santos-Valdez, Jerez-Sosa agreed to the plan and never indicated

any reluctance to commit the robbery.  Santos-Valdez testified that during the cab ride,

Jerez-Sosa called Duanes-Gonzales and Valle-Matos to confirm they were waiting in

the getaway car.  Jerez-Sosa spoke in Spanish so that Berhanu would not understand

what he was saying.  As Santos-Valdez pointed the gun at Berhanu, Jerez-Sosa got out

of the back seat and went to the driver's side to "block the door so the guy wouldn't be

spooked and just run out of there."  Santos-Valdez testified that Jerez-Sosa "took the

keys out of the car, he broke the radio, the things that you use to — what it's called, the

walkie-talkie or whatever, he broked [sic] it."  Santos-Valdez said Jerez-Sosa "on his

---

[1] Emphasis added.

5

own . . . blocked the camera with that sun thing. . . . It was something that he seen on his own and he covered." Jerez-Sosa and Santos-Valdez then fled "together." Santos-Valdez denied ever pointing a gun at Jerez-Sosa or threatening him in any way.

Defense counsel cross-examined Santos-Valdez about the testimony that he did not point the gun at Jerez-Sosa:

> Q     And isn't it true, Mr. Santos-Valdez, that you pointed that gun at my client?
> A     That's not true.
> Q     Okay. You knew my client had been shot in the past; right? He's got a mark on his neck where he's been shot.
> A     <u>From committing robberies, yes</u>.
> Q     You knew that he had been shot and you knew that he would be frightened of you when you pulled that gun?
> A     That's — that's a —
> Q     It's a yes or no, yes or no?
> A     That's not [the] truth.
> Q     Thank you. Isn't it true that on September 7th, 2002, (sic) that you pulled a gun on my client and you forced him to participate in this robbery?
> A     That's not [the] truth.[2]

After defense counsel concluded cross-examination, the prosecutor asked to "address a potential issue of opening the door outside the presence of the jury." During the recess, the prosecutor stated:

> One of the questions asked of Mr. Santos-Valdez was whether he was aware of the Defendant being shot in the neck. . . . The response from Mr. Santos-Valdez was that the Defendant got shot committing a robbery. Obviously that was not something we intended to elicit, but I think it was an appropriate response.

The prosecutor argued that "a key part of Dr. Young's opinion in this case is that, because the Defendant was shot in the neck, that he has a heightened sensitivity to firearms and a heightened sense of alarm," and sought approval to ask Santos-Valdez

---

[2] Emphasis added.

further questions about his knowledge of Jerez-Sosa being shot.

Defense counsel argued Santos-Valdez "violated the pretrial agreement by bringing up [an ER] 404(b) accusation of prior misconduct" and moved for a mistrial. The trial court stated that "the way things stand right now, I would be inclined to grant the mistrial motion," but recessed to allow parties to submit briefing.

> Well, I'm inclined to grant the mistrial based on the significant prejudice that I think would be caused by the jury knowing that [Jerez-Sosa] had committed prior robberies. I can't think of anything more prejudicial.
>
> However, the only reason not to do it right now is if this type of testimony would come out anyway when Dr. Young testifies. . . .
>
> And so if this type of testimony were to come out anyway, then perhaps it's not as prejudicial as it appears at this time.

The following day, the trial court heard argument on the mistrial motion. Defense counsel asserted Santos-Valdez violated the trial court's order when he testified Jerez-Sosa "said he got away with robbing a liquor store and was successful at it," and when Santos-Valdez testified Jerez-Sosa was shot while "committing robberies." The prosecutor argued both statements were admissible to rebut the claim of duress. The trial court denied the motion for mistrial without prejudice, finding that it was difficult to assess the seriousness of the irregularity until the end of trial.

Nonetheless, the trial court decided to give a curative instruction to the jury. When the trial reconvened, the trial court instructed the jury as follows:

> [C]ertain evidence has been admitted in this case for only a limited purpose. During his testimony, Mr. Santos-Valdez referred to an alleged statement by the Defendant, Mr. Jerez-Sosa, that he, the Defendant, had successfully robbed a liquor store. Mr. Santos-Valdez also stated that the Defendant told him that he was allegedly shot in the neck during the commission of a prior robbery.
>
> If you find these statements credible, you may consider them only for the purpose of assessing the Defendant's state of mind on September 7th, 2012, and for no other purpose. You may not consider these statements for their truth, that is, whether or not the Defendant committed

7

other robberies. Any discussion of the evidence during your deliberations must be consistent with this limitation.

When Santos-Valdez resumed the stand, the prosecutor asked whether Santos-Valdez had personal knowledge of Jerez-Sosa successfully robbing liquor stores and being shot in the neck during a robbery, or whether Jerez-Sosa had merely told Santos-Valdez these things. Santos-Valdez stated that his testimony was based only on what Jerez-Sosa had told him.

Q    . . . . In your previous testimony, you said that the Defendant told you that he wanted to rob a liquor store because he had been successful in the past; correct?

A    That's correct.

Q    But you have no firsthand knowledge of this. This is only what the Defendant told you; correct?

A    That's correct.

Q    In your previous testimony, you also said the Defendant was shot in the neck while committing robberies; correct?

A    That's correct.

Q    But again, you have no firsthand knowledge of this. This is only what the Defendant told you; correct?

A    That's correct.

The trial court admitted into evidence a CD[3] containing 214 still images from the cab's security camera. The images show Jerez-Sosa making a phone call, Santos-Valdez pointing a gun at Berhanu, and Jerez-Sosa entering the front seat of the cab. At no time during the footage does Santos-Valdez point the gun at Jerez-Sosa.

At the end of the State's case, Jerez-Sosa renewed his motion for a mistrial. The trial court denied the motion "without prejudice to your raising the issue in the event of a conviction."

Jerez-Sosa testified that on the day of the robbery, he had been working as a

---

[3] Compact disc.

mechanic in Tacoma when he began experiencing pain in his neck. Jerez-Sosa said that he went to Safeco Field to buy Percocet because "[t]here are people who sell drugs" there. Jerez-Sosa said he saw Santos-Valdez at Safeco Field and knew he sold drugs. Jerez-Sosa testified he had met Santos-Valdez once before "but he was never my friend. And I never lived with him." Jerez-Sosa denied telling Santos-Valdez that he had ever robbed a liquor store or been shot while committing a robbery. Jerez-Sosa denied planning the robbery with Santos-Valdez.

Jerez-Sosa testified that after Santos-Valdez told him they could get drugs on Beacon Hill, they decided to hail a cab. Jerez-Sosa said that when the cab driver parked on Beacon Hill, Santos-Valdez pulled out a gun. According to Jerez-Sosa, Santos-Valdez told the driver to give him his wallet and money and then hit the driver with the gun. Jerez-Sosa testified that Santos-Valdez then pointed the gun at him and said, "And you watch the front. Check, check the front."

Jerez-Sosa testified he had been shot by strangers on two occasions, once in the neck and once in the foot, while walking around in the Central District of Seattle. Jerez-Sosa stated he had nightmares about being shot, and being around guns made him scared and apprehensive. Jerez-Sosa testified he was afraid he would be shot if he did not do what Santos-Valdez said. "When he pointed the gun at me, I had this feeling inside like when one knows that death is coming." Jerez-Sosa testified he grabbed a bag from the front seat of the cab and gave it to Santos-Valdez. Jerez-Sosa testified that he ran away from Santos-Valdez toward the light rail station where he got on a southbound train.

During cross-examination, the State introduced photographs from Valle-Matos'

Facebook page taken in 2012. The photographs show Jerez-Sosa, Valle-Matos, and Duanes-Gonzalez posing and smiling with a gun. Jerez-Sosa admitted knowing that Valle-Matos had a gun and that he was having a good time when the photographs were taken.

Dr. Young testified that he interviewed Jerez-Sosa and his stepmother, reviewed the charging document and the police reports, and administered two psychological tests. Jerez-Sosa told Dr. Young that he was "shot at random by a stranger" on two separate occasions in 2008. Dr. Young testified that in his opinion, Jerez-Sosa developed PTSD as a result of being shot and was suffering from PTSD at the time of the robbery. Dr. Young testified that individuals suffering from PTSD "tend to be jumpy and to have an exaggerated startle reflex if something startles them," and are "wary and vigilant about what's going on around them that they fear might hurt them." Dr. Young testified, in pertinent part:

> For an individual with post-traumatic stress disorder, particular [sic] PTSD stemming from being shot, he would probably be more reactive and more fearful than he would have been without the PTSD. . . . I believe that PTSD renders him more vulnerable to that kind of terrifying moment.

But Dr. Young admitted that if Jerez-Sosa "lied to me or fabricated a story, then — then that line of reasoning would be invalid."

The jury convicted Jerez-Sosa of robbery in the first degree. The jury returned a special verdict finding that Jerez-Sosa was armed with a firearm at the time of the crime.

Defense counsel renewed the motion for a mistrial. The trial court initially granted the motion. The court expressed concern about the jury's ability to distinguish between statements admitted for their truth and statements admitted for the purpose of

showing Jerez-Sosa's state of mind at the time of the crime.

However, on reconsideration, the trial court denied the motion for a mistrial. The court concluded the statement that Jerez-Sosa told Santos-Valdez that he had previously robbed a liquor store would have been admitted "to show that this was not a — there was no duress, but that Mr. Jerez-Sosa was a willing participant." As to the statement that Jerez-Sosa told Santos-Valdez he was shot while committing robberies, the trial court concluded that "if the Defense had not raised this issue, having been shot in the neck, we might have a different situation. But this was a critical part of the Defense argument." The trial court ruled the statement would have been admissible to rebut Jerez-Sosa's claim that Santos-Valdez knowingly capitalized on the vulnerability of someone who had previously been shot, or to impeach Dr. Young, who based his PTSD diagnosis on Jerez-Sosa's claim that he was shot as an innocent bystander. The trial court ruled the testimony was probative and not outweighed by its potential for prejudice. Jerez-Sosa appeals.

## ANALYSIS

Jerez-Sosa argues the court erred in denying the motion for a mistrial. We review a trial court's decision to deny a motion for mistrial for abuse of discretion. State v. Jackson, 150 Wn.2d 251, 276, 76 P.3d 217 (2003). A trial court abuses its discretion in denying a motion for a mistrial only if its decision is manifestly unreasonable or based on untenable grounds. State v. Allen, 159 Wn.2d 1, 10, 147 P.3d 581 (2006).

A trial court has broad discretion to rule on irregularities during the course of a trial. State v. Lewis, 130 Wn.2d 700, 707, 927 P.2d 235 (1996). Determining whether an irregularity during trial is so prejudicial as to warrant a mistrial depends on (1) the

seriousness of the irregularity, (2) whether the statement was cumulative of other properly admitted evidence, and (3) whether the irregularity could be cured by an instruction. State v. Perez-Valdez, 172 Wn.2d 808, 818, 265 P.3d 853 (2011).

The trial court is in the best position to determine if a trial irregularity caused prejudice. Perez-Valdez, 172 Wn.2d at 819. A mistrial should be granted "only when the defendant has been so prejudiced that nothing short of a new trial can insure that the defendant will be tried fairly." State v. Mak, 105 Wn.2d 692, 701, 718 P.2d 407 (1986). We will reverse the trial court only if there is a substantial likelihood the trial irregularity prompting the mistrial motion affected the jury's verdict. State v. Rodriguez, 146 Wn.2d 260, 269-70, 45 P.3d 541 (2002).

Jerez-Sosa contends the statements were a serious irregularity because the testimony violated the trial court's order in limine. The trial court's order prohibited witnesses from referring to any ER 404(b) misconduct "with respect to Mr. Jerez-Sosa." ER 404(b) applies to prior misconduct offered as substantive evidence. State v. Wilson, 60 Wn. App. 887, 891, 808 P.2d 754 (1991). Santos-Valdez did not testify that Jerez-Sosa actually committed other robberies or that he had been shot during a robbery. Instead, Santos-Valdez testified Jerez-Sosa told him about the prior robberies and the shooting. Santos-Valdez made clear that he had no firsthand knowledge about what Jerez-Sosa told him.

While Santos-Valdez's testimony was not cumulative, the statements were admissible to rebut the defense of duress. Jerez-Sosa claimed he agreed to rob Berhanu because Santos-Valdez pointed a gun at him. Evidence that Jerez-Sosa told Santos-Valdez he had previously robbed a liquor store was relevant to rebut Jerez-

12

Sosa's claim that he would not have participated in the robbery except under duress. Dr. Young testified that his opinion that Jerez-Sosa acted under duress would be "invalid" if Jerez-Sosa "lied to me or fabricated a story." Evidence that Jerez-Sosa told Santos-Valdez he was shot while committing a robbery cast doubt on Dr. Young's opinion that Jerez-Sosa was vulnerable to duress because of his PTSD.

Finally, the trial court instructed the jury that they could consider Santos-Valdez's statements only for the purpose of assessing Jerez-Sosa's "state of mind" and not for their truth. We presume the jury follows the instructions of the court. State v. Montgomery, 163 Wn.2d 577, 596, 183 P.3d 267 (2008). The case Jerez-Sosa relies on, State v. Escalona, 49 Wn. App. 251, 742 P.2d 190 (1987), is distinguishable.

In Escalona, the State charged the defendant with second degree assault with a knife. Escalona, 49 Wn. App. at 252. The trial court granted a defense motion to exclude any mention of the defendant's prior conviction for the same crime. Escalona, 49 Wn. App. at 252. At trial, the victim testified that on the day of the assault, he was nervous because the defendant " 'already has a record and had stabbed someone.' " Escalona, 49 Wn. App. at 253. This court held the trial court erred in denying the defendant's request for a mistrial because of "the seriousness of the irregularity . . . combined with the weakness of the State's case and the logical relevance of the statement." Escalona, 49 Wn. App. at 256.

Here, unlike Escalona, there was no evidence that Jerez-Sosa had previously been convicted of robbery. And unlike in Escalona, here, the evidence was admissible to rebut the claim of duress. Further, unlike Escalona, there was no "paucity of credible evidence" supporting the conviction. Escalona, 49 Wn. App. at 255-56. Berhanu

13

testified that Jerez-Sosa demanded his wallet, took his cell phones, and took his bag, and that Jerez-Sosa and Santos-Valdez appeared to be working together. Berhanu also testified Santos-Valdez did not threaten Jerez-Sosa. The security camera footage corroborated Berhanu's testimony. The fact that Jerez-Sosa disabled the cab's radio and security camera also contradicts his claim that he took items from Berhanu only because Santos-Valdez forced him to do so. Mitchell also testified that Jerez-Sosa and Santos-Valdez appeared to be working together. The record supports the decision that Santos-Valdez's testimony did not amount to a serious trial irregularity that was so prejudicial as to deny Jerez-Sosa a fair trial.

We conclude the trial court did not abuse its discretion in denying the motion for a mistrial, and affirm the jury conviction.

WE CONCUR: