IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 87082-3-I |
| Respondent, | DIVISION ONE |
| v. | |
| PAUL JAMES BIEKER AKA JOHN DOE, WHOSE UNIQUE GENETIC SEQUENCE OF DEOXYRIBONUCLEIC ACID IS COMMONLY IDENTIFIED BY WASHINGTON STATE PATROL CRIME LABORATORY NO. 303-000607, | UNPUBLISHED OPINION |
| Appellant. | |

BOWMAN, J. — Paul James Bieker appeals his jury conviction of rape in the first degree of A.E. He argues the trial court was biased and erred by denying his motion to change venue and admitting the sexual assault kit used in A.E.'s examination. He also asserts that cumulative error deprived him of a fair trial. We affirm.

FACTS

In October 2010, the State charged "John Doe," whose identity was unknown, with rape in the first degree.[1] The State alleged that in March 2003, John Doe sexually assaulted A.E. At the time, A.E. was a 17-year-old high

---

[1] The State also charged John Doe with kidnapping in the first degree. The trial court later dismissed that charge and it is not at issue on appeal.

school student and lived with her father in McCleary, a small town in Grays Harbor County.

A.E. would later testify that on the evening of March 6, 2003, she arrived home from her job at a local coffee stand and parked her car in the detached garage. A.E.'s father was not home. A.E. testified that she started to walk through the garage side door and as she pulled the door shut behind her, a man came from behind, covered her mouth, and pushed her back into the garage, where a violent physical struggle ensued.

A.E. testified that the man pushed her to the ground, "slamming [her] head into the concrete." He pulled the hood of her sweatshirt over her eyes to obscure her vision, duct taped her eyes and mouth shut, and zip tied her arms together behind her back. He then bound her legs and feet and tried to put her in the trunk of her car. A.E. fought back, and the man "dropped [her] a few times" and tried "slamming the trunk lid" on her head. He eventually put A.E. in the back seat. The man then drove her car for what A.E. estimated was about 20 to 30 minutes, hitting her every time she tried to sit up, until she felt the road change to gravel and he stopped the car. He told her to get out and walk but she could not because her feet were still bound, and she started to scream through the duct tape. The man then "picked [A.E.] up off the ground and threw [her] into the back seat," pulled down her pants, and raped her.

A.E. testified that afterward, the man drove her car to another location but she did not know where because her "eyes were still duct taped with a hood." A.E. said that the man got out of the car but came back after a few minutes. A.E.

2

"didn't move," hoping "he thinks [she is] dead." The man then cut the zip ties off her wrists and told A.E. that he "hoped [she] was dead, but if [she] wasn't, within 24 hours, [her] house would be burned down and [her] dad would be shot, and the rest of [her] life would be miserable." He then told her he would "always be watching" her, shut the car door, and left.

A.E. testified that she sat in the back seat for some time, not moving. After she had heard nothing for "a while," she started ripping the duct tape from her eyes and mouth. Once she could see again, she realized she was at an unmanned fire station about a half mile from her house. Her legs were still bound, but she found a tire gauge or a flashlight—she could not recall which— and managed to get her stick-shift car started and drive home in first gear. A.E. never saw her assailant during the attack.

Once home, A.E. pulled into the driveway and honked the horn until her father came out. He later testified that A.E. "flung" her car door open and yelled at him to "grab scissors, come quick." A.E.'s father cut the "large zip ties" from A.E.'s feet. He then followed A.E. as she ran into the house, "frantically closing the curtains, trying to shut all the windows, mak[ing] sure nobody can see in." He described his daughter as "[d]irty" and "abused" with "duct tape wrapped around her neck" and badly "beaten." A.E.'s father called 911 "immediately."

Police responded and eventually took A.E. to the hospital, where sexual assault nurse Pamela Montagu examined her and swabbed her body with swabs from a sexual assault kit. Montagu gave the sealed kit to Detective Edward McGowan of the Grays Harbor County Sheriff's Office. Detective McGowan then

3

placed the kit in an evidence locker until another detective transported it to the Washington State Patrol Crime Laboratory (WSPCL). The WSPCL developed a DNA profile of the man who raped A.E. using the swabs from the kit but could not match it to anyone.

Years later in 2012, Grays Harbor County Sheriff's Deputy Darren Wallace learned of A.E.'s case when he was promoted to detective. In 2020, Detective Wallace applied for and obtained a grant for money to pay for genealogical testing in cold cases. He then sent the DNA extracts from A.E.'s sexual assault kit to a private lab, which gave Detective Wallace "investigative suggestions" based on familial matches through DNA databases like Ancestry and 23andMe. Detective Wallace narrowed the list of potential matches using traditional investigative techniques and decided to start by trying to get a DNA sample from Bieker.

In 2021, Detective Wallace obtained a search warrant to put a tracker on Bieker's vehicle. He then followed Bieker, watched him throw away a used coffee cup, retrieved the cup, and delivered it to the WSPCL for DNA analysis. A forensic scientist from the crime lab testified that the DNA from the vaginal swabs in A.E.'s sexual assault kit matched the DNA obtained from Bieker's discarded cup. Detective Wallace arrested Bieker based on that match and later obtained additional swabs from Bieker's cheeks, which also matched the DNA from A.E.'s sexual assault kit.

In June 2021, the State filed an amended information that named Bieker

4

as the defendant that it originally identified as John Doe.[2]  Bieker pleaded not guilty.  In December 2021, he moved for a change of venue from Grays Harbor County to Pierce County.  He asserted that "[t]he media coverage of this case has been expansive and detailed in Grays Harbor County" and that law enforcement "has made comments on the investigation procedures of the case, [Bieker's] arrest . . . , and his possible ties to other unrelated cold cases and serious crimes in the area, such as the high-profile disappearance of Lindsey Baum," a 10-year-old who disappeared from McCleary in 2009 and whose remains were later found in eastern Washington.  The trial court denied Bieker's motion.

Bieker's jury trial began in June 2022.  Bieker's defense was consent.  He testified that around 2003, he and his wife were having marital issues and he began frequenting the coffee stand where A.E. worked.  According to Bieker, A.E. was "very friendly" to him and would "chat [him] up."

Bieker testified that on "the night in question," he was talking with A.E. at the coffee stand and she suggested that they meet and "talk some more" after her shift.  He testified that A.E. proposed they meet at the fire station, where he got into her car.  According to Bieker, the two talked for about 10 minutes, started kissing, and as things progressed, moved into the back seat.  Bieker testified that although A.E. was touching him, he was not getting aroused, so he asked, "[C]an we be kinky."  After further discussion, A.E. agreed to have her wrists and ankles

---

[2] The State also added additional charges but the trial court later dismissed all counts except for the original first degree rape count.  The additional charges are not at issue on appeal.

zip tied. He testified that he was never able to get fully aroused and that she "insulted him." Bieker felt "humiliated" and decided to leave. He then cut the zip ties from A.E.'s hands but she kicked him before he could get to her feet and he "backed off." Bieker testified that he left A.E. in the back seat of her car, went home, and never went back to the coffee stand or sought out A.E. again.

A.E. testified that she did not recognize Bieker's face, that his name "didn't ring a bell" when she heard he was arrested, and that she had never seen him until "this case started back up." She also testified that when she heard his voice in court, she recognized it and "[c]ouldn't be more sure" that it was the voice of her assailant.

Over Bieker's objections, the court admitted the 911 call recording and A.E.'s sexual assault kit as exhibits. The jury convicted Bieker as charged, including several aggravating factors by special verdict. The court imposed an indeterminate exceptional sentence of 360 months to life.

Bieker appeals.

ANALYSIS

1. <u>Motion to Change Venue</u>

Bieker argues that the trial court erred by denying his motion to change venue. We disagree.

"The court may order a change of venue to any county in the state . . . [u]pon motion of the defendant, supported by affidavit that he believes he cannot receive a fair trial in the county where the action is pending." CrR 5.2(b)(2). We review a trial court's decision on a motion to change venue for an abuse of

discretion. *State v. Stiltner*, 80 Wn.2d 47, 52, 491 P.2d 1043 (1971). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *State v. Taylor*, 193 Wn.2d 691, 697, 444 P.3d 1194 (2019).

Bieker sought a venue change based on pretrial publicity about his case. To determine whether a trial court abused its discretion by granting or denying a motion for a change of venue due to pretrial publicity, we apply the factors identified in *State v. Crudup*, 11 Wn. App. 583, 524 P.2d 479 (1974). *State v. Jackson*, 150 Wn.2d 251, 269-70, 76 P.3d 217 (2003).

> The *Crudup* factors are
>
> (1) the inflammatory or noninflammatory nature of the publicity;
> (2) the degree to which the publicity was circulated throughout the community; (3) the length of time elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the difficulty encountered in the selection of the jury; (5) the familiarity of prospective or trial jurors with the publicity and the resultant effect upon them; (6) the challenges exercised by the defendant in selecting the jury, both peremptory and for cause; (7) the connection of government officials with the release of publicity; (8) the severity of the charge; and (9) the size of the area from which the venire is drawn.

11 Wn. App. at 587. The fact that the majority of prospective jurors remember a case, without more, "is 'essentially irrelevant.' " *Jackson*, 150 Wn.2d at 269 (quoting *Patton v. Yount*, 467 U.S. 1025, 1035, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984)). Instead, " '[t]he relevant question is not whether the community remembered the case, but whether the jurors at [the] trial had such fixed opinions that they could not judge impartially the guilt of the defendant.' " *Id.*[3] (quoting

---

[3] Alterations in original.

*Patton*, 467 U.S. at 1035). Ultimately, "[t]he 'defendant must show a probability of unfairness or prejudice from pretrial publicity.' " *Id.* (quoting *State v. Hoffman*, 116 Wn.2d 51, 71, 804 P.2d 577 (1991)).

Bieker does not make this showing. He points out that media reports about his June 2021 arrest included statements from law enforcement that they were looking into possible connections to the Baum case. As for the first *Crudup* factor, Bieker characterizes the reports as "unquestionably inflammatory." But the media reports Bieker attached to his motion were essentially factual, describing the underlying investigation and the DNA evidence that led to his arrest. *See State v. Maupin*, 63 Wn. App. 887, 895, 822 P.2d 355 (1992) (articles were of a "factual, noninflammatory nature" where, although numerous and with a "few prejudicial statements," they mostly "described the crime, the investigation, the victim, and the support offered to the victim's family by the community").

One article reported that sheriff officials were "looking into if Bieker could be connected to the kidnapping and murder of Lindsey Baum."[4] But it also reported that "there is currently no evidence to support that claim" and quoted an officer as stating, " 'There is currently no evidence that would connect the two investigations.' " And while another article indicated that law enforcement noted " 'eerie similarities' " between A.E.'s assault and the Baum kidnapping, it also quoted law enforcement as stating that the two cases could be " 'just totally unrelated.' " Similarly, although an officer stated in a "Cop Talk" radio interview

---

[4] Emphasis omitted.

that they were investigating a possible connection to the Baum case, Bieker does not dispute that the officer also stated, "[T]here is no evidence connecting Mr. Bieker to Lindsey Baum."

Turning to the second and third *Crudup* factors, even assuming news of Bieker's arrest, his release on bail, and the investigation into a possible connection to Baum was widely circulated, Bieker did not dispute that the most recent news coverage of his case was from June 29, 2021—almost a year before jury selection. And as for the Cop Talk interview, the State presented evidence that "the audio of that program was never made available to the public for streaming on . . . any . . . platform" and that the original live stream garnered only "25 listens."

Next, as to the fourth through sixth *Crudup* factors, "the best test of whether an impartial jury c[an] be empaneled [i]s to attempt to empanel one." *Hoffman*, 116 Wn.2d at 72-73. And here, the record shows that the trial court took great care to ensure that it empaneled only jurors whose partiality was not affected by publicity about the case.

At the outset of jury selection, before the venire was even brought in, the court dismissed three jurors that the prosecutor and defense counsel identified as part of social media sites that included posts expressing "fixed opinions and conviction of . . . beliefs that . . . Bieker [was] guilty and should be punished." During voir dire, the court asked the venire whether any of them "kn[e]w . . . Bieker, or anything about . . . Bieker." To avoid tainting the venire, the court added that "[t]his is the kind of question I don't want anybody to say

9

what it is they think they know, at all, I just want a yes or no at this point."

Significantly, only eight prospective jurors answered yes. The trial court

dismissed one of them for cause after she explained that she had known Bieker

for a long time and that because of their relationship, she did not think she could

be fair and impartial. While discussing the matter with that juror, the trial court

was clear that it did not want her to say anything that she knew about Bieker, and

she did not.

As for the remaining seven jurors, the trial court questioned each of them

individually and outside the presence of the other jurors. Three said they had

read about Bieker's case, but each confirmed that they could decide the case

based solely on the evidence. Another shared that she once worked with

Bieker's ex-wife, but she also stated that she had heard nothing about the case

from any source, that nothing about her relationship with Bieker's ex-wife would

come into play should she be empaneled, and that she could decide the case

based on the facts. The trial court dismissed the last three for cause on its own

accord,[5] and Bieker points to no instance where the trial court rejected any

attempt to dismiss a juror for cause based on exposure to pretrial publicity.

Finally, as to the seventh through ninth *Crudup* factors, although some

media reports included quotes from law enforcement and the charge against

Bieker was severe, the venire was drawn from the entirety of Grays Harbor

---

[5] One of those jurors was from McCleary and said he had seen social media posts expressing opinions about the case. Another stated, "[S]everal years ago, I was told that somebody by [Bieker's] name had some grooming behavior with a girl's soccer team." The third was also from McCleary and had heard things from his mother, who worked for the school district.

County. Even Bieker acknowledged the county had a population of around 75,000, and he did not dispute that most of the jurors would not come from McCleary. *See State v. Langford*, 67 Wn. App. 572, 586, 837 P.2d 1037 (1992) (characterizing a county of 73,000 registered voters as "a fairly large population base" from which to draw a venire).

In short, while some of the *Crudup* factors may have weighed in favor of changing venue, several did not. And critically, Bieker presents only speculative assertions, which he does not support with citations to the record,[6] that any juror seated in his trial " 'had such fixed opinions that they could not judge impartially [his] guilt.' " *Jackson*, 150 Wn.2d at 269 (quoting *Patton*, 467 U.S. at 1035). Bieker does not show that the trial court abused its discretion by denying his motion to change venue.

2. Judicial Bias

Bieker asserts that the trial court had a preconceived opinion on his guilt, so judicial bias deprived him of a fair trial.[7] We disagree.

---

[6] For example, Bieker asserts that "it is reasonable to presume there were prospective jurors who wanted to be part of the trial and not share the necessary information," that there was a "real probability that [jurors] recalled [the Baum case] as [Bieker's] case carried on through testimony" even if they did not recall it during jury selection, and that it "is inevitable" that jurors were exposed to people wearing Lindsey Baum T-shirts at trial.

[7] The State asserts that Bieker failed to preserve this issue for appeal because he did not raise it below. We exercise our discretion to reach the issue. *See State v. Russell*, 171 Wn.2d 118, 122, 249 P.3d 604 (2011) ("RAP 2.5(a) provides that if a party fails to raise an issue in the trial court, the appellate court may decline to review the issue on appeal. However, the rule's use of the term 'may' indicates that it is a discretionary decision to refuse review. Nothing in RAP 2.5(a) expressly prohibits an appellate court from *accepting* review of an issue not raised in the trial court." (citation omitted)).

"Criminal defendants have a due process right to a fair trial by an impartial judge." *In re Pers. Restraint of Swenson*, 158 Wn. App. 812, 818, 244 P.3d 959 (2010) (citing WASH. CONST. art. I, § 22; U.S. CONST. amends. V, VI, XIV). We presume that a trial court is fair and impartial, and "[t]he party seeking to overcome that presumption must provide specific facts establishing bias." *In re Disciplinary Proc. Against King*, 168 Wn.2d 888, 904, 232 P.3d 1094 (2010); *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 692, 101 P.3d 1 (2004).

Bieker asserts that "[f]rom the very beginning of the case the trial judge made statements clearly demonstrating his bias regarding Mr. Bieker." But a review of the record shows that Bieker takes each statement out of context and that none constitutes evidence of bias.

Bieker first points out that during motions in limine, the trial judge said:

> [T]his is an identification case, where it's not in dispute that the alleged victim was, in fact, assaulted, but the question is, who did it, right? Whether or not M[r]. Bieker committed the crime. I don't think factually there is a dispute that [A.E.] suffered an attack, right?

Bieker claims these questions show that the judge "dismiss[ed] the notion that there may have been a consensual sexual encounter." But the judge was *asking* defense counsel to address the *State's characterization* of the case as a consent-only case, stating, "[S]o maybe I am missing something, and forgive me, I don't mean to presume anything." Defense counsel then clarified that consent was at issue, and the judge indicated his understanding.

Bieker next points out that when the judge ruled that A.E.'s father's 911 call could be admitted under a hearsay exception, he explained, "I am absolutely satisfied that the alleged victim's statements at the time to her father are

12

absolutely an excited utterance[ ]." Bieker asserts that the judge "had not heard the 911 tape when it made these comments" and that the judge's comments made "clear" his "bias regarding the allegations." But the judge did not need to listen to the 911 tape because he made an interlocutory ruling based on the State's offer of proof. Indeed, the judge made clear that the State "has a number of burdens of foundation," and that "[i]f those are not met, . . . then the evidence doesn't come in, that's the bottom line." While the judge's comments reflected his confidence that his ruling was correct based on the information before him, they were not evidence of bias. *See Davis*, 152 Wn.2d at 692 ("Judicial rulings alone almost never constitute a valid showing of bias.").

Next, Bieker points to voir dire, when the trial judge restated a prospective juror's observation that there must have been some evidence that resulted in the State pressing charges. But the judge immediately explained to the prospective juror that "that's not the standard," and that he must "decide this case . . . based solely on the evidence produced in court, not based on anything outside of court." Similarly, Bieker argues the judge's ruling on his change-of-venue motion showed bias when the judge characterized as "fact" that the State brought charges because there was a "DNA match." It is accurate that the State charged Bieker because his DNA matched the sample from the swab taken from A.E. And by making these observations, the judge did not, as Bieker asserts, suggest that the court did not plan to hold the State to its burden to present evidence of the DNA match or, ultimately, Bieker's guilt.

13

Finally, Bieker notes that on the second day of trial, defense counsel observed that the trial judge "emoted" during opening statements and a witness' direct examination by shaking his head, smiling, and looking puzzled. But even defense counsel did not think it was "anything conscious." The trial judge "appreciate[d]" that counsel brought the matter to his attention and explained that "certainly it was not intentional, not willful, not even conscious." The judge then said he would "not only . . . make effort not to do so," but would also "remind the jury that they are not to consider that and they are supposed to disregard that entirely." Defense counsel declined, reasoning that the jury would later be so instructed and that he just "want[ed] the Court to know that [he] observed it a little." Counsel then commented that "reacting [is] just, I think, our nature." Bieker points to nothing in the record to show that it ever became an issue again.

Bieker has presented no evidence showing actual or potential bias as required to overcome the presumption that the trial judge was impartial.

3. Admission of DNA Evidence

Bieker contends that the trial court erred by admitting exhibit 29, the sexual assault kit, because the swabs therein were not sufficiently identified or authenticated under ER 901(a). We disagree.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). Under ER 901(a), "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." "This

requirement is met 'if sufficient proof is introduced to permit a reasonable trier of fact to find in favor of authentication or identification.' " *State v. Bradford*, 175 Wn. App. 912, 928, 308 P.3d 736 (2013) (quoting *State v. Danielson*, 37 Wn. App. 469, 471, 681 P.2d 260 (1984)).

Bieker argues that ER 901(a) was not satisfied here because Montagu, the nurse who took the vaginal swabs from A.E., "never testified that she placed the swabs in the sexual assault kit." So, "the State failed to demonstrate the swabs in the sexual assault kit were in fact the ones taken from A.E."

But Montagu testified that she recognized exhibit 29 as the sexual assault kit that she used to examine A.E. because her signature and handwriting were on the front, along with a date. She also testified that there was a process she went through for taking swabs:

> Q    Do you know what you did with that — let's talk about, when you take a kit and you take these swabs, is there a process you have to go through?
> A    Yes.
> Q    Okay. What do you do with them?
> A    So once I get the swabs, they — before I can package them, they have to be dried. So we had some wood pallets, sort of look like a cribbage board, that had holes in them, so you can set the swabs up, and then we had a locked drying fan box, so that they would dry for us before we packaged them.
> Q    Because you couldn't leave until those were dry and packaged up, correct?
> A    Correct.
> Q    So you stayed with it?
> A    If I was not directly with it, it's locked, and the keys stay with me. The keys do not go anywhere else.

When asked whether she followed that process in A.E.'s case, Montagu responded, "Absolutely."

While Montagu did not say the words, "I placed the swabs in the sexual assault kit," her testimony that she followed a procedure that called for drying and packaging the swabs was sufficient to permit a reasonable trier of fact to find in favor of the swabs' authenticity and identification. The trial court did not err by admitting the sexual assault kit.

4. Cumulative Error

As a final matter, Bieker argues that cumulative error deprived him of a fair trial. The cumulative error doctrine entitles a defendant to a new trial "when cumulative errors produce a trial that is fundamentally unfair." *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012). Reversal is not required where the errors are few and have little to no effect on the outcome of the trial. *State v. Greiff*, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). Because no trial error occurred here, the cumulative error doctrine does not apply.

We affirm Bieker's conviction of first degree rape of A.E.

_____
Brenner, J

WE CONCUR:

_____     _____
Chung, J.                    Smith, C.J.